**BRITISH STEEL P.L.C.,** Plaintiff,

v.

**UNITED STATES,** Defendant.

**USINAS SIDERURGICAS de MINAS GERAIS, S.A.,** et al., Plaintiffs,

v.

**UNITED STATES,** Defendant.

**INLAND STEEL INDUSTRIES, INC.,** et al., Plaintiffs,

v.

**UNITED STATES,** Defendant.

**LTV STEEL CO., INC.,** et al., Plaintiffs,

v.

**UNITED STATES,** Defendant.

**LACLEDE STEEL CO.,** et al., Plaintiffs,

v.

**UNITED STATES,** Defendant.

**LUKENS STEEL CO., INC.,** et al., Plaintiffs,

v.

**UNITED STATES,** Defendant.

Slip Op. 96–156.

Court Nos. 93–09–00550–CVD, 93–09–00558–CVD, 93–09–00567–CVD to 93–09–0070–CVD.

United States Court of International Trade.

Sept. 10, 1996.

Steptoe & Johnson (Richard O. Cunning-
ham, Peter Lichtenbaum), (Sheldon E. Hoch-
berg, William L. Martin, II), on brief, (Rich-
ard O. Cunningham, Sheldon E. Hochberg),

on oral argument, Counsel for British Steel plc; Morgan, Lewis & Bockius (Mark R. Joelson), (Marcela B. Stras, Roger C. Wilson), on brief, Counsel for the Government of the United Kingdom, et al.; Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Thomas R. Howell, Martha J. Talley, John A. Ragosta, Guy C. Smith, John R. Magnus, Jeffrey D. Nuechterlein, Philip Karter, Michael R. Geroe, Jennifer Danner Riccardi), on brief, (Martha J. Talley, John A. Ragosta), on oral argument, Counsel for Geneva Steel, et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance, Barry J. Gilman), on brief, (D. Scott Nance, Barry J. Gilman), on oral argument, Counsel for Geneva Steel, et al. in No. 93–09–00550–CVD.

Willkie Farr & Gallagher (Christopher S. Stokes), (William H. Barringer, Nancy A. Fischer), on brief, (Christopher S. Stokes), on oral argument, Counsel for USIMINAS; Dickstein Shapiro & Morin (Arthur J. Lafave, III, Douglas N. Jacobson), Counsel for Companhia Siderurgica Nacional; Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer, John J. Mangan), (Barry J. Gilman, D. Scott Nance), on brief, (Barry J. Gilman, Scott Nance), on oral argument, Counsel for Gulf States Steel, Inc., et al.; Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, John A. Ragosta, Guy C. Smith, Michael R. Geroe), on brief, (John A. Ragosta), on oral argument, for Gulf States Steel, Inc., et al. in No. 93–09–00558–CVD.

Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, John R. Magnus, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief, (Martha J. Talley, John A. Ragosta, John R. Magnus), on oral argument, Counsel for Inland Steel Indus., Inc., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (Barry J. Gilman, D. Scott Nance), on oral argument, Counsel for Inland Steel Indus., Inc., et al.; Weil, Gotshal & Manges LLP (Stuart M. Rosen), (M. Jean Anderson, Jeffrey P. Bialos, Diane M. McDevitt, Scott Maberry; and Stuart M. Rosen, Mark F. Friedman, Jonathan Bloom), on brief, (M. Jean Anderson, Stuart M. Rosen), on oral

argument, Counsel for Usinor Sacilor, Sollac and GTS in No. 93–09–00567–CVD.

Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, O. Julia Weller, Kristen M. Neller, Michael R. Geroe), on brief, (John A. Ragosta, Guy C. Smith), on oral argument, Counsel for LTV Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, Counsel for LTV Steel Co., et al.; Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cumins), Counsel for Thyssen Stahl AG, et al.; LeBoeuf, Lamb, Greene & MacRae, L.L.P. (Pierre F. de Ravel d'Esclapon, Mary Patricia Michel), Counsel for AG der Dillinger Hüttenwerke; Hogan & Hartson (Lewis E. Leibowitz, Steven J. Routh, Paul Minorini), Counsel for Fried, Krupp AG Hoesch–Krupp, et al. in No. 93–09–00568–CVD.

Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Linda C. Menghetti, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on brief, (John A. Ragosta, Jeffrey D. Nuechterlein, Jennifer Danner Riccardi), on oral argument, Counsel for Laclede Steel Co., et al. Armco Steel Co., et al. and Bethlehem Steel Corp., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, Counsel for Laclede Steel Co., et al., Armco Steel Co., et al., and Bethlehem Steel Corp., et al.; Morrison & Foerster (Donald B. Cameron), (Julie C. Mendoza, Craig A. Lewis, Sue–Lynn Koo, Panagiotis C. Bayz), on brief, (Donald B. Cameron, Julie C. Mendoza), on oral argument, Counsel for Dongbu Steel Co., et al. in No. 93–09–00569–CVD.

Dewey Ballantine (Michael H. Stein), (Alan Wm. Wolff, Martha J. Talley, John A. Ragosta, Guy C. Smith, Scott L. Forseth, Michael R. Geroe), on brief, (John A. Ragosta), on oral argument, Counsel for Lukens Steel Co., et al.; Skadden, Arps, Slate, Meagher & Flom (John J. Mangan, Robert E. Lighthizer), (D. Scott Nance), on brief, (D. Scott Nance), on oral argument, Counsel for Lukens Steel Co., et al.; Shearman & Sterling (Jeffrey M. Winton), (Robert E. Herzstein,

Shavit Matias), on brief, Counsel for Altos Hornos de Mexico, S.A. de C.V. in No. 93–09–00570–CVD.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (A. David Lafer); Stephen J. Powell, (Terrence J. McCartin, Robert E. Nielsen, David W. Richardson, Elizabeth C. Seastrum, Marguerite Trossevin), on brief, Office of Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, Counsel for defendant.

**OPINION**

CARMAN, Judge:

As noted several times by this Court in previous opinions, a number of actions were consolidated by order of the Court of International Trade on February 4, 1994. *See British Steel plc v. United States,* 879 F.Supp. 1254, 1261–62 (CIT 1995) (*British Steel I* ), *appeals docketed,* Nos. 96–1401 to – 06 (Fed.Cir. June 21, 1996); *British Steel plc v. United States,* 924 F.Supp. 139, 146 (CIT 1996) (*British Steel II* ), *appeals docketed,* Nos. 96–1401 to –06 (Fed.Cir. June 21, 1996); *British Steel plc v. United States,* 929 F.Supp. 426, 430–31 (CIT 1996) (*British Steel III* ).[1] After a scheduling conference with the parties, the Court entered a scheduling order applying to all of the consolidated cases. *See British Steel I,* 879 F.Supp. at 1262. The scheduling order required parties to brief jointly five general issues, consisting essentially of privatization, allocation methodology, grant methodology, sales denominator, and disproportionality. That aspect of the proceeding was dubbed the "general issues" proceeding, and the Court used *British Steel plc v. United States,* Consol. Court No. 93–09–00550–CVD, and the case caption used in this opinion, to identify it. The scheduling order also provided for parties briefing issues specific to their respective cases; *i.e.,* "country-specific" briefing.

On February 9, 1995, this Court issued an opinion addressing all five general issues, including the issue of disproportionality which this Court remanded. *See id.* at 1320–28. On October 17, 1995, this Court held two oral arguments. The first concerned the disproportionality remand, and the second concerned issues raised by the parties' briefing in the Korean country-specific action, *Laclede Steel Co,* et al. *v. United States,* Consol. Court No. 93–09–00569–CVD. The present opinion addresses both the remand on the general issue of disproportionality as well as issues raised by the parties' motions in *Laclede Steel.* Familiarity with this Court's opinion in *British Steel I,* remanding *Certain Steel Products from Korea,* 58 Fed.Reg. 37,-338 (Dep't Comm.1993) (final determ.) (*Korean Final Determination* ), is presumed.

Dongbu Steel Company, Ltd. (Dongbu), Pohang Iron & Steel Company, Ltd. (POSCO), Pohang Coated Steel Company, Ltd. (POCOS), Pohang Steel Industries Company, Ltd. (PSI), and Union Steel Industries Company, Ltd. (Union) (collectively "Respondents") oppose the Department of Commerce's ("Commerce" or "Department") disproportionality remand determination, *Final Results of Redetermination Pursuant to Court Remand* British Steel plc v. United States Slip Op. 95–17 (Feb. 9, 1995) (*Redetermination* ). Laclede Steel Company, AK Steel Corporation, Geneva Steel, Bethlehem Steel Corporation, Gulf States Steel, Incorporated of Alabama, Inland Steel Industries, Incorporated, LTV Steel Company, Incorporated, Lukens Steel Company, National Steel Corporation, Sharon Steel Corporation, U.S. Steel Group a Unit of USX Corporation, and WCI Steel, Incorporated (collectively "Domestics" or "Domestic Producers") support Commerce's *Redetermination.*

Respondents have also filed briefs under the country-specific *Laclede Steel* action challenging six aspects of the *Korean Final Determination.* Domestic Producers challenge two aspects of the *Korean Final Determination* in their country-specific *Laclede Steel* briefs.

---

**1.** An additional action was consolidated on December 9, 1994. *See British Steel I,* 879 F.Supp. at 1262 n. 1.

. BACKGROUND

### A. *The Court's Remand Instructions to Commerce on the General Issue of Disproportionality*

In *British Steel I*, this Court remanded the *Korean Final Determination*, and, with respect to the general issue of disproportionality, ordered Commerce to:

> explain, if it is able, what evidence on the record demonstrates that programs existed during the period of investigation to benefit the respondent steel companies by giving them preferential access to both domestic and direct foreign credit markets, and how the respondent steel companies received that access to credit. Commerce is directed to advise the Court whether the Government of Korea's (GOK) control over long-term lending in Korea and the program concerning alleged preferential access to direct foreign loans administered by the Ministry of Finance were industry specific, and point out what evidence on the record, if any, demonstrates specificity. Commerce is further directed to explain in both cases, if it is able, why the large share of loans and access to loans by the respondent steel companies is attributable to an industry specific program of the GOK, and not to some other reason, such as expanding capital needs or other reasons consistent with commercial considerations. Commerce should also calculate what countervailing duties, if any, should be imposed

upon the respondent steel companies consistent with this opinion....

*British Steel I*, 879 F.Supp. at 1331.

### B. *Commerce's Remand Determination on Disproportionality*

In the *Redetermination*, Commerce reasons that because the subsidies at issue are of an indirect nature, Commerce must find a causal relationship, or nexus, between the government programs of general control and the benefits received from those programs.[2] *Redetermination* at 4. Commerce further reasons the requirement of a nexus enters a countervailing duty analysis only in that Commerce must find a nexus between an indirect government program and the benefit conferred, not between the benefit and the specificity of the benefit.[3] *Id.* at 7 (footnote omitted).

Commerce concludes record evidence demonstrates a causal nexus between a program of GOK general control of the Korean financial system and the benefits conferred. *Id.* at 15. According to Commerce, the GOK has used its control of the Korean financial system to create a chronic shortage of credit, and to selectively exempt favored industries—including steel—from the shortage in order to meet government objectives. *Id.* at 20. Thus, the nexus between the GOK control and the benefits received is aggressive or active government targeting of access to scarce long-term credit to the Respondents. *Id.* at 15. Commerce more specifically identifies

---

**2.** Commerce contrasts the need for a finding of a nexus in the case of an indirect program with the case of a direct program. *See Redetermination* at 7. According to Commerce, direct programs may include, for example, distribution of government funds or debt forgiveness. Commerce explains that with a direct program, "there is no question of a nexus between the government action and the benefit to the respondent companies. Normally, the benefit conferred is defined by the nature of the program, for example, the benefit conferred by a grant program is the grant itself...." *Id.* at 8.

**3.** According to Commerce, "imposing the requirement of an affirmative showing that *de facto* specificity is the result of particular government actions is contrary to the statute, the intent of

Congress, and past judicial precedent." *Redetermination* at 12. Commerce further explains:

> [T]he statute provides that the Department may impose a countervailing duty if it determines that a benefit provided by a government action is conferred upon a specific industry. No intent or purposeful government action is required, as acknowledged by the Court, to show that a specific industry is receiving the benefit. The reasons that the program is specific are irrelevant to the analysis.

*Id.; see also id.* at 12–15 (discussing the 1988 amendment to 19 U.S.C. § 1677(5)(B), *Cabot Corp. v. United States,* 9 CIT 489, 620 F.Supp. 722 (1985), *appeal dismissed,* 4 Fed.Cir. (T) 80, 788 F.2d 1539 (1986), and the Uruguay Round Agreements Act, Statement of Administrative Action (1994)).

the causal link between the government action (*i.e.*, the continued identification of steel as a strategic industry in conjunction with control of the financial system) and the benefit received (unlimited access to low-interest loans) consists of (1) the *de jure* preferences for steel before 1985;[4] (2) direct and indirect expressions of continued support for steel after 1985;[5] (3) a major government sponsored investment project for the steel industry; and (4) a volume of loans at favorable rates that exceeded the pre–1985 volume.

*Id.* at 21–22.

Commerce further finds record evidence demonstrates GOK involvement in the allocation of direct foreign loans. *Id.* at 37. According to Commerce, the GOK monitors the foreign currency supply and attempts to minimize its impact on the Korean economy. The GOK accomplishes this through the Foreign Capital Inducement Act and accompanying regulations which require GOK approval of all direct foreign loans, establish eligibility criteria, and require initial consultations with the GOK antecedent to negotiations for a direct foreign loan. *Id.* at 37–38.

Regarding specificity, Commerce explains in the *Redetermination* that record evidence supports the finding that long-term and direct foreign loan programs were industry specific "based on the Department's standard disproportionality and dominant user *de facto*

analyses." *Id.* at 39 (footnote omitted). As to specificity of the long-term loan program, Commerce reasons:

> One of the factors the Department considers in examining *de facto* specificity is whether the industry in question, in fact, received a disproportionate share of the benefits. In this case, in order to determine whether the Korean steel industry was receiving a disproportionate share of the long-term loans from the entire Korean financial market, the Department compared the steel industry's percentage share of available loans with its percentage share of the gross domestic product.[6]

*Id.* at 40–41. Commerce adds its specificity analysis does not rest on the gross domestic product (GDP) comparison alone. Commerce explains it also compared the patterns of long-term lending to the steel industry during the time of *de jure* favoritism to the industry's long-term lending after termination of the *de jure* system. *Id.* at 41–42. According to Commerce, this comparison reveals the steel industry's share of credit actually increased slightly after elimination of the *de jure* system, "indicating that even though the laws had changed, the actual lending pattern had not changed."[7] *Id.* at 43 (footnote omitted). Commerce summarizes that based on the comparison of lending patterns in light of Respondent's admitted past subsi-

---

**4.** For this factor, Commerce cites to the Heavy and Chemical Industry Program of 1973, Korea's Iron and Steel Promotion Act of 1970, and a number of studies and articles discussing each. *See Redetermination* at 24–29.

**5.** The factors Commerce discusses on this point include: (1) a Korea Development Bank (KDB) official's statement at verification that despite the addition of a provision to the KDB Act providing that companies other than those listed may also borrow from the KDB, listed companies maintained a favorable position; (2) the number of outstanding National Investment Fund loans, in 1989, made to the Heavy and Chemical Industry despite changes to lending guidelines; (3) a 1989 report discussing the liberalization of the Korean financial markets; (4) the GOK's 1988 designation of POSCO as a "Public Interest Company," and a prospectus POSCO filed with the United States Securities and Exchange Commission; and (5) a GOK "drive to create a second integrated steel mill at Kwangyang Bay," which Commerce identifies as "the most convincing exam-

ple of the extensive support the steel industry enjoyed at the highest levels of government." *Redetermination* at 29–37.

**6.** According to Commerce, "[t]he Court affirmed this methodology in *British Steel*," *Redetermination* at 41 (citing *British Steel I*, 879 F.Supp. at 1325–26), and also "found that Commerce had shown 'that the respondent steel companies have a large share of the loans and access to credit when analyzed using GDP as a measuring device,'" *id.* (quoting *British Steel I*, 879 F.Supp. at 1327 n. 78).

**7.** "Indeed," Commerce continues, "the Court has found that the Department has 'demonstrated that the respondent steel companies have a slightly greater percentage of loans since the *de jure* program was terminated.' Moreover, the plaintiffs admitted in their administrative case brief that the lending patterns did not change after the laws changed." *Redetermination* at 43 (footnotes omitted).

dization, and the GDP comparison, Commerce reasonably found the steel industry received a disproportionate share of available long-term loans, and that the long-term loan program is thus specific to the steel industry. *Id.* at 43–44.

As to direct foreign loans, Commerce explains it examined whether the steel industry was the dominant user of the program. Commerce essentially restates its position regarding evidence discussed in the *Korean Final Determination* and concludes "the steel industry was by far the largest user of direct foreign loans" based on foreign loan borrowing statistics supplied by the GOK.[8] *Id.* at 44. Accordingly, Commerce has concluded "*de facto* specific administration is occurring in this case." *Id.* at 45.

After discussing specificity, Commerce turns to the Court's instruction that it "explain . . . if it is able, why the large share of loans and access to loans by the respondent steel companies is attributable to an industry specific program of the GOK, and not to some other reason, such as expanding capital needs or other reasons consistent with commercial considerations." *British Steel I,* 879 F.Supp. at 1331. Commerce first disputes this instruction:

> [T]he statute, legislative history, and judicial case law establishes that the Department is not required to examine why a particular distribution of benefits occurred, as long as the nexus connecting the government action to the benefit is established. However, as we did in the [*Korean* ] *Final Determination* and pursuant to the Court's remand instruction, we explain

[here] why each of the economic factors raised by the respondents and the Court do not affect the results of this remand. *Redetermination* at 46.

Commerce then rejects three economic considerations previously discussed: (1) capital intensity of the steel industry; (2) investment cycles; and (3) that the steel industry is less dependent than other industries on external financing. *See id.* at 46–53. Regarding capital intensity, Commerce used data provided by the GOK to determine whether other capital intensive industries[9] "received a large amount of loans by comparing their percentage share of long-term loans with their share of GDP." *Id.* at 47. Commerce concluded that "[a]lthough over time some of these capital intensive industries consistently received a large share of loans, the statistics for other industries did not support respondents' contention that there is a positive correlation between capital intensity and proportion of loans received." *Id.* Commerce also rejected Respondents' argument that "the Korean steel industry's investment cycles explain the disproportionate distribution of loans." *Id.* at 49. According to Commerce, this argument

> is based on the incorrect assumption that the steel industry's investment cycles are derived from market considerations, free of government involvement. In this case, . . . the investment cycles, which are derived from capital needs at particular points in time, were not in any way derived from market considerations. On the contrary, the "investment needs" of POSCO were *artificially created by the GOK*.[10]

---

**8.** Commerce reports these statistics indicate "the iron and steel industry has received approximately 60 percent of all direct foreign loans to the manufacturing sector since 1985, and over 40 percent of all direct foreign loans to all industries since this time." *Korean Final Determination,* 58 Fed.Reg. at 37,344 (reprinted in *Redetermination* at 44).

**9.** Commerce "determined whether an industry was capital intensive by comparing its percentage share of GDP with its percentage of fixed capital consumed." *Redetermination* at 47.

**10.** To support its conclusion, Commerce discusses the Kwangyang Bay facility:

> In fact, the GOK's plans to build the integrated steel mill at Kwangyang Bay is the essence of

our argument that the record unquestionably establishes that a causal exists nexus [sic] between the GOK's control of the financial system and the steel industry's unlimited access to scarce credit at favorable interest rates.

. . . [M]ost of the outstanding long-term loans to the steel industry during the POI were obtained after 1985. The purpose of these loans was to support the building of the Kwangyang Bay integrated steel mill. . . . If we were convinced that POSCO . . . made a [sic] independent, unfettered decision, based entirely on commercial considerations, to build the Kwangyang Bay steel mill, we would not have concluded that the GOK continued to target the steel industry for preferential access to scarce long-term credit at favorable rates after

*Id.; see also id.* at 52 ("Since the GOK created the capital needs and the resulting investment cycles, such cycles are not derived from true commercial considerations but instead are a consequence of the government's decision to create a steel industry....."). Finally, Commerce rejects internal financing as a factor for consideration: "[T]he fact that an industry maintains substantial internal financing has no bearing on the share of external funds which it receives. A government may still bestow a bounty or grant on a specific industry regardless of its internal financial status." *Id.* at 53. Commerce concludes the *Redetermination* requires no adjustments to the countervailing duty calculations made in the *Korean Final Determination.*

.STANDARD OF REVIEW

In reviewing determinations and remand determinations by Commerce, this Court will hold unlawful those found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C. § 1516a(b)(1)(B)(i) (1994)).

DISCUSSION

A. *The Disproportionality Remand Determination*

Respondents contend Commerce's *Redetermination* is unsupported by substantial evidence and contrary to law, and advance four primary arguments in support of this contention. First, Respondents argue Commerce did not comply with this Court's instructions regarding evidence of specificity. According to Respondents, in *British Steel I* this Court did not affirm Commerce's original specificity finding. Furthermore, Respondents argue, a causal nexus is an integral component of the specificity analysis—there must be a nexus between a clearly-

defined government program and specificity. Respondents claim in the present case, however, "[e]vidence of a program is non-existent." (Dongbu, *et al.*'s Comments in Opp'n to Final Results of Redeterm. (Resp'ts' Br.) at 8.) Thus, Commerce's GDP and time period analyses are both flawed because "[i]n both cases, no evidence of such government action exists, and contrary evidence has been presented demonstrating why lending to the steel industry increased *without* action by the government." (*Id.* at 10 (footnote omitted).) With respect to direct foreign loans, Respondents argue Commerce has merely restated in the *Redetermination* that the steel companies received a relatively large share of loans, despite this Court's finding in *British Steel I* that this showing was inadequate.

Second, Respondents contend the record conclusively demonstrates the GOK did not direct credit to the steel industry. According to Respondents, Commerce relies on anecdotal information, not record evidence verified during the investigation, as key factual evidence. In contrast, Respondents argue, "abundant record evidence" demonstrates the GOK was not directing credit to the steel industry. (*See, e.g., id.* at 14 ("Commerce ... ignores evidence about the fundamental changes in the composition of banks' loan portfolios and how they confirm changes in the GOK's *de jure* policies.... Commerce never addresses the critical question of *how* the GOK exercises its control in the absence of any policies or mechanisms.") (footnotes omitted).) All mechanisms favoring the steel industry ended by 1985, Respondents allege, and no evidence supports Commerce's theory that the GOK continued to direct credit to the steel industry through undocumented mechanisms. Respondents further argue that alleged GOK "targeting" of financing to the Kwangyang Mill also fails for lack of evidence,[11] and that the designation of POS-

the termination of the *de jure* lending preferences. However, the record overwhelmingly establishes that the decision to invest in Kwangyang Bay was not made by POSCO. Instead, it was made by the GOK....
*Redetermination* at 49–50. Even if POSCO had made the decision to invest in the Kwangyang Bay steel mill, Commerce continues, it "was not

made in accordance with commercial considerations." *Id.* at 50.

11. Aside from a lack of evidence, Respondents argue Commerce's finding that the GOK used its control to target financing for the Kwangyang mill is troubled because "Commerce admits that in fact it never investigated the commercial rea-

CO as a "Public Interest Corporation" is irrelevant. Finally, Respondents claim that as with alleged access to domestic credit, Commerce did not identify any GOK action targeting the steel industry for preferential access to foreign credit.[12]

Third, Respondents complain Commerce's reasons for not finding direct evidence of an alleged program of government control are legally erroneous. Respondents argue that even with indirect subsidies, there must be specific evidence identifying government actions which resulted in benefits. In this case, Respondents argue

> Commerce is reduced to implying that the GOK enlisted the cooperation of a series of privately-managed financial institutions (including branches of foreign-owned banks) to secretly carry out this "*de facto* program" without generating a single incriminating document, or even having been heard of by experts actually working in the same credit markets.

(*Id.* at 24.)[13] Respondents further contend that in the present case, Commerce failed to consider the results of its own verification,[14] and that Commerce's analysis is not supported by the record as a whole.[15]

Finally, Respondents contend the pattern of lending to the steel industry is consistent with commercial considerations, including the steel industry's ratios of internal to external financing, capital intensity, and investment cycles. Respondents dispute Commerce's treatment in the *Redetermination* of these considerations.

Domestics support Commerce's *Redetermination*. According to Domestics, the *Redetermination* satisfies all requisite elements for finding a subsidy countervailable because Commerce properly found: (1) a government program of general control over the Korean financial system, and GOK acts and policies to direct credit preferentially to the steel industry; (2) the loans provided benefits given the GOK's control of the financial sector; (3) overwhelming evidence of a causal nexus between the GOK's acts and the benefits received; and (4) the benefits were *de facto* specific. Domestics further argue Commerce was not required to demonstrate any nexus between the government act and selectivity of the benefit. Instead, they reason, Commerce is only required to examine whether there is a nexus between the government act and the benefit received given the indirect nature of the subsidy at issue.

---

sonableness of the investment in Kwangyang." (Resp'ts' Br. at 19 (citation omitted).)

**12.** For example, Respondents assert that
[a]part from whether a requirement to "report" a loan plan can be construed as a requirement for "initial consultations," Commerce verified (but does not mention in its remand) that "there were *no* situations from 1986 to the present where a company was able to negotiate an unguaranteed loan below the required ceiling and was denied permission by the [Ministry of Finance] to borrow directly on foreign capital markets."

... [T]he remand determination fails to acknowledge the most basic and fundamental fact with respect to direct foreign loans: they were *all* negotiated between private parties, based solely on the creditworthiness of the borrower, without government involvement and with the explicit requirement that no government guarantees could be used on these loans.
(Resp'ts' Br. at 21–23 (footnotes omitted).)

**13.** Respondents also dispute Commerce's characterization of the program at issue as a " '*de facto* program.' " (Resp'ts Br. at 25 (quoting *Redetermination* at 31).) Respondents "suggest that the

newly-created concept of a *de facto program* is unlawful because it serves only to legitimize a Commerce methodology that finds subsidies without demonstration that the government in question, in fact, even acted." (*Id.* at 27.)

**14.** Respondents argue "Commerce is required by statute and precedent to rely solely on verified information in making its final determination." (Resp'ts' Br. at 31 (footnote omitted).) Respondents insist that in this case, however,

Commerce has completely disavowed its statutory obligation by ignoring information whose accuracy and completeness it had fully assessed and instead simply *assumed* the existence of contrary facts on the basis of journal articles voluntarily supplied by an interested party to the agency, and the agency's own unfounded suspicions.
(*Id.* at 29.)

**15.** In this case, Respondents argue, Commerce "used the opportunity created by this remand to sift through the record to find whatever quotations or other information could possibly give rise to a *suspicion* that the GOK carried out an undocumented program to 'direct' credit to the steel industry." (Resp'ts' Br. at 33.)

Domestics also argue Commerce properly relied on independent articles and reports in its examination of that nexus.

Commerce asks this Court to sustain the *Redetermination* in its entirety. In so doing, Commerce advances three central contentions. First, Commerce argues it has complied with this Court's instructions concerning specificity. According to Commerce, the finding of a nexus is not required as part of the specificity finding. Commerce also reiterates that the GDP comparison was not the sole basis for a finding of specificity in the case of access to domestic loans, and repeats Commerce's conclusions in the *Redetermination* concerning its finding of specificity with regard to direct foreign loan access. Second, Commerce argues its determination that GOK control over the Korean financial system caused the steel industry to receive a large share of available loans is supported by substantial evidence on the record. Third, Commerce contends Respondents' comments on the remand determination inappropriately raise the issue of whether a program exists. According to Commerce, this Court ruled a government program did exist, and the existence of a program was not the subject of the remand. Commerce further argues there is no requirement that Commerce identify explicit government documents in order to find an indirect subsidy. Here, Commerce reasons the substantial evidence supporting Commerce's finding that an indirect subsidy program existed consists of verified Respondents' submissions, laws, journal articles, and news articles.

The countervailing duty statute at issue requires that Commerce, in order to countervail a bounty or grant, determine

> whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries. Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.

19 U.S.C. § 1677(5)(B) (1988). Commerce agrees the statute requires Commerce to find the subsidy is "provided to" a specific enterprise or industry, and reasons that in the case of an indirect subsidy such as the ones at issue here, a showing of a causal nexus between the program and the benefit is required. *See, e.g., Redetermination* at 7. Commerce takes pains in its *Redetermination*, however, to stress its position that no nexus is required between the benefit and specificity, but only between the program and the benefit. *See, e.g., id.* at 8–14.

The Court first notes that Commerce misinterprets in part this Court's holding in *British Steel I* regarding a nexus. In the *Redetermination*, Commerce states it has "determined that, since the subsidies identified are indirect, and since the nature of such programs is government targeting of scarce financial resources, the *targeting nexus identified by the Court* is integral to the countervailability of the programs." *Redetermination* at 11 (emphasis added). Commerce's use of the word "targeting" is misleading in this instance. "Targeting" implies purposeful government action. This Court clearly stated in *British Steel I* it would "not require Commerce to find *purposeful* government action in order to countervail." *British Steel I,* 879 F.Supp. at 1326.

Commerce also appears to misconstrue the Court's remand instruction regarding other commercial considerations. The discounting of commercial considerations goes to the existence of a nexus and, in this case, is properly part of the analysis. Given the nature of the program at issue—general GOK control over the financial system—Commerce's nexus analysis might be strengthened if Commerce were able to eliminate reasonable commercial explanations for the Respondents' receipt of access to credit.

■ These misinterpretations, however, are not fatal to Commerce's *Redetermination*. As this Court found in *British Steel I*, Commerce has shown, in the *Korean Final Determination*, GOK control over the Korean financial system. *See British Steel I,* 879 F.Supp. at 1327 n. 78. In the *Redetermination*, Commerce now sets forth the nexus between the government control and the

preferential access to credit as the Court required. Although this Court, as stated above, "will not require Commerce to find *purposeful* government action in order to countervail," *British Steel I*, 879 F.Supp. at 1326, Commerce's finding of government targeting in the instant case satisfies the statute's requirement that Commerce find the subsidy was "provided to" Respondents. Also due to the nature of the nexus Commerce found in this case, purposeful targeting, Commerce's essential restatement of its rejection of other commercial considerations does not prevent this Court from sustaining Commerce's conclusion. Commerce has identified substantial evidence, as summarized above, to support its finding of nexus, despite Respondents' contentions to the contrary. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted).

■ Additionally, as to Commerce's finding regarding specificity, "[w]hile this Court might prefer that Commerce use a different methodology, the Court will, nevertheless, defer to Commerce and its expertise in designing and implementing a methodology that is reasonable." *British Steel I*, 879 F.Supp. at 1325 (citing *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F.Supp. 961, 966 (1986) ("The deference granted or extended to the agency's interpretation of its statutory mandate also applies to the methodology that the agency employs in fulfilling its lawfully delegated mission.") (citations omitted), *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987)). Accordingly, this Court upholds Commerce's conclusion that the GOK program of general control over the Korean financial system provided industry-specific benefits to Respondents in the form of preferential access to long-term loans.

This Court also upholds Commerce's *Redetermination* as it pertains to the direct foreign loan access. Here too, Commerce has identified substantial evidence on the record, as summarized above, supporting its finding

of a nexus between the government program and the benefits received. Accordingly, this Court sustains the *Redetermination.*

**B.** *The Country–Specific Issues Raised in Laclede Steel*

1. The Construction of 15 Port Berths at Kwangyang Bay

In the *Korean Final Determination*, Commerce found the GOK provided infrastructure for an industrial estate known as Kwangyang Bay. *See Korean Final Determination*, 58 Fed.Reg. at 37,346. Commerce also found POSCO uses 15 berths in the Kwangyang Bay facility at no charge. Commerce explained all other users are required to pay POSCO berthing fees as set out in the GOK's tariff schedule, and the GOK normally charges a user fee, or dockyard fee, for use of berths at all of Korea's ports. *Id.* at 37,347. Accordingly, Commerce found the *use* of the 15 berths by POSCO to be countervailable. Commerce further found, however, that the *construction* of the 15 port berths did not provide a countervailable benefit to POSCO because POSCO funded the construction. *Id.* at 37,348.

■ Domestics contest Commerce's finding that POSCO built and paid for the 15 port berths in question. (Mem. in Supp. of Pls.' 56.2 Mot. for Partial J. Upon the Agency R. (Domestics' 56.2 Br.) at 15.) Domestics essentially argue: (1) there is no information of record that POSCO built the port berths, but there is record evidence the GOK built these port berths; (2) Commerce accepted the GOK's and POSCO's unsupported and unverified assertions that POSCO built and paid for the berths; and (3) because the GOK and POSCO failed to provide evidence supporting their claim that POSCO built and paid for the port berths, Commerce should have used best information available. Accordingly, Domestics ask this Court to remand the case to Commerce with instructions to use best information available to determine what entity built and paid for the port berths at Kwangyang Bay.

In response, Commerce identifies the evidence upon which it relied to reach its con-

clusion that POSCO built and paid for the port berths. (*See* Def.'s Mem. in Opp'n to Pls.' Mots. for J. Upon the Agency R. (Commerce's Resp.) at 80–83.) This evidence includes questionnaire response statements from the GOK and POSCO that POSCO built and paid for the port berths, the GOK's explanations as to why POSCO built the port berths, the GOK's reporting of the sum POSCO spent on construction, and POSCO's provision of the business plan it submitted to the GOK for the building of the port berths. Commerce also explains that at verification: (1) Ministry of Construction officials confirmed that POSCO completed the construction; (2) Commerce verified the legislative scheme concerning POSCO's exemption from port berth fees for the berths in question and POSCO's collection of fees from other users; and (3) officials from the Korea Maritime and Port Authority stated POSCO is exempt from fees on dockyards it built until the investment has been recouped or until twenty years have elapsed, whichever occurs first. Commerce further explains its method of verification in this case:

> Commerce spent 10 days verifying POSCO's and the GOK's responses and, with a few minor exceptions, determined that, on the whole, the figures contained in the responses were accurate. In verifying the information concerning the port berths built by POSCO, Commerce, with its limited time and resources, chose to examine the application of the Korean legislative scheme which permits private companies to build infrastructure and administer these facilities until such time as the private companies recover their costs or 20 years have passed. Commerce examined the books of the Korean Maritime Port Authority ... which administers this scheme, in particular with regard to the port berths built and paid for by POSCO and found no discrepancies. Based on this information and the fact that the figures contained in the POSCO and GOK responses for the most part passed verifica-

tion, Commerce determined that the information and statements by POSCO and GOK regarding who built and paid for the ports were reliable for purposes of reaching a final determination.

In addition, since the respondents complied with all of Commerce's requests for information on this issue in a timely manner, in the form requested and without hindering the investigation, and because the information was verified, Commerce has no basis upon which to resort to best information available.

(*Id.* at 84–85 (citations omitted).)

The Court finds there is substantial evidence on the record to support Commerce's conclusion. As to Domestics' arguments concerning verification, the Court notes that

> [o]f course, verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe. Hence, evasion is a common possibility, but only when audits uncover facts indicating the actuality thereof are auditors compelled to search further.

*Bomont Indus. v. United States*, 14 CIT 208, 209–10, 733 F.Supp. 1507, 1508 (1990). Hence, because Commerce "determined that the information and statements by POSCO and GOK regarding who built and paid for the ports were reliable for purposes of reaching a final determination," the Court finds no fault with Commerce's verification on this issue. Likewise, the Court finds Commerce was not required to use best information available in this instance. *See Olympic Adhesives, Inc. v. United States*, 8 Fed.Cir. (T) 69, 79, 899 F.2d 1565, 1574 (1990) ("[The statute] clearly requires *noncompliance with an information request* before resort to the best information rule is justified, whether due to refusal or mere inability.") (citation omitted).[16] Accordingly, the Court rejects

---

**16.** In *Olympic Adhesives*, the Court of Appeals made its statement in reference to 19 U.S.C. § 1677e(b) (1982). In 1988, section 1677e(b) was redesignated as section 1677e(c). *See Olympic Adhesives*, 8 Fed.Cir. (T) at 69, 899 F.2d at

1567 (citing Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1331(1), 102 Stat. 1107, 1207 (codified as amended at 19 U.S.C. § 1677e)).

132

Domestics' arguments on the issue of the construction of the port berths.

2. Selective Depreciation Due to Revaluation of Assets—The GOK's Administration of TERCL Article 56–2

■ Article 56–2 of Korea's Tax Exemption and Reduction Control Act (TERCL) addresses special treatment for revaluation of assets at the time of going public. *Korean Final Determination*, 58 Fed.Reg. at 37,350. Specifically, Article 56–2 "allows a company that is making an initial public offering to revalue its assets without meeting the requirement in the Asset Revaluation Act of a 25 percent change in the wholesale price index since the company's last revaluation." *Id.*

In the *Korean Final Determination*, Commerce explained the Respondents provided the following information in response to Commerce's investigation of whether the GOK provided POSCO with a specific exemption from the requirements for asset revaluation by allowing POSCO to revalue in 1982 and 1988/1989 despite the fact that Korea's wholesale prices increased by only 5.09 percent in the interim—less than the required 25 percent:

POSCO was partially privatized in 1988, a process that culminated in the listing of POSCO's shares on the Korea Stock Exchange on June 10, 1988. Article 56–2 was enacted on November 28, 1987, and applied to all companies making an initial public offering from January 1, 1987 until the provision was abolished.... Pursuant to this Article, companies that listed on the Korea Stock Exchange between January 1, 1987 and December 31, 1988 (as was the case with POSCO) had until December 31, 1989 to revalue their assets. A company that listed its stock after December 31, 1988 had to revalue its assets prior to being listed on the stock exchange. The GOK argues that POSCO acted in accordance with this provision because it listed its shares in June of 1988, and the results of the investigation report on its revaluation were reported to the GOK on September 29, 1989.

*Id.* at 37,351. "From the information available on the record," Commerce determined it appears that POSCO did not revalue more of its assets than is generally allowed under Korean law.... In the case of POSCO's 1989 revaluation, the vast majority of the revaluation surplus (the newly revalued amount of assets subject to revaluation minus their former value) resulted from increases in the value of machinery and equipment. Revaluation of such assets is permissible under the relevant laws, and there is no evidence that the GOK intervened to allow POSCO to revalue more assets than other firms are allowed to revalue.

*Id.* Commerce further explained that after verification, petitioners submitted evidence they argued indicated POSCO's revaluation may have been significantly greater than that of the other companies revalued. However, because of "shortcomings" in the evidence submitted, and because it was submitted too late to verify, Commerce could draw no conclusions from it. Accordingly, Commerce concluded POSCO was not provided with a selective exemption from the 25 percent requirement in the Asset Revaluation Act, and that the GOK did not provide preferential treatment to POSCO concerning the revaluation. *Id.*

Domestics challenge Commerce's finding that the GOK did not administer TERCL Article 56–2 in a manner that provided selective benefits to POSCO with respect to the 1989 revaluation. Domestics argue the GOK failed to provide requested information concerning the amount of revaluations under TERCL Article 56–2 necessary for Commerce to determine whether POSCO was the dominant user or disproportionate beneficiary under this law. Accordingly, Domestics contend, Commerce should have used best information available and found that POSCO was the dominant user and disproportionate beneficiary of the GOK program. Domestics request this Court remand this case to Commerce with instructions to determine whether POSCO was the dominant user or disproportionate beneficiary of Article 56–2.

In its response, Commerce describes the questions it asked, the GOK's responses, and

Commerce's verification to demonstrate Commerce's finding is supported by substantial evidence on the record. (*See* Commerce's Resp. at 86–89.) Resort to best information available was not justified, Commerce asserts, because "although the GOK did not provide the information in response to Commerce's initial request for information, it did submit the information in the form requested by Commerce's supplemental questionnaire." (*Id.* at 94 (citation omitted).) Commerce argues that the information was thoroughly verified, and no discrepancies were found. Furthermore, Commerce contends, its determination that the program did not provide specific benefits is supported by substantial evidence, and Domestics' data, from which Domestics argue POSCO received a dominant or disproportionate share of benefits, is flawed.[17]

The Court rejects Domestics' argument that Commerce should have used best information available. *See Olympic Adhesives,* 8 Fed.Cir. (T) at 79, 899 F.2d at 1574. Additionally, the Court finds there is substantial evidence to support Commerce's determination that POSCO was not provided with a selective exemption from the 25 percent requirement in the Asset Revaluation Act, and that the GOK did not provide preferential treatment to POSCO concerning the revaluation. The possibility that alternative interpretations of the evidence exist is not sufficient reason to disturb the agency's decision. *See Consolo,* 383 U.S. at 620, 86 S.Ct. at 1026 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted). Accordingly, the Court sustains Commerce's determination as to this issue.

### 3. GOK's Direction of Preferential Long–Term Credit to the Steel Industry

Respondents have set forth a challenge on the issue of directed credit in their country-specific brief. Their challenge, however, substantially overlaps with arguments concerning access to domestic long-term loans in the disproportionality aspect of this opinion discussed above. On the issue of directed credit in the country-specific case, Respondents contend: (1) Commerce improperly determined all long-term lending in Korea constituted a countervailable program; and (2) verified evidence on the record conclusively demonstrates no government policy or action exists to direct credit to the steel industry. This second argument consists of the following sub-arguments: (a) the "GDP Test of Disproportionality" is not supportable; (b) direct government lending is not directed to the steel industry; (c) the GOK's actual policy objectives emphasized allocation of loans to small- and medium-sized firms and not to the steel industry; (d) anecdotal evidence of GOK appointment of bank officials provided no basis to conclude long-term credit was directed to the steel industry; (e) Commerce failed to demonstrate GOK "informal" control of the Korean financial system constituted policies that could result in the preferential allocation of long-term loans to the steel industry; and (f) Commerce failed to show the GOK's control of interest rates resulted in a preference for the steel industry.

This Court has already sustained Commerce's finding of a government program as well as Commerce's finding of a nexus between the government control and the preferential access to credit. *See supra* part A. In light of the *Redetermination* and this Court's finding that the *Redetermination* is supported by substantial evidence and is otherwise in accordance with law, the Court rejects Respondents' country-specific arguments on this issue.

### 4. Countervailability of GOK Expenditures to Construct Infrastructure at the Kwangyang Bay Industrial Estate

In the *Korean Final Determination,* Commerce found the GOK had provided infra-

---

17. The data is flawed, Commerce reasons, because it covers
less than a quarter of the companies which participated in the program, *i.e.,* only 45 out of a potential 207 companies. Further, petitioners' statement that POSCO received 75 percent

of the benefit could not be substantiated because data is missing from over 75 percent of all of the companies which participated in the program.
(Commerce's Resp. at 95 (citation omitted).)

structure for the Kwangyang Bay Industrial Estate. *See Korean Final Determination*, 58 Fed.Reg. at 37,346. Commerce also found the GOK's provision of infrastructure constituted a countervailable benefit to one of the Respondents, POSCO. In so doing, Commerce used a tripartite test as provided for in its *Proposed Regulations*. *See* 54 Fed. Reg. 23,366, 23,379–80 (Dep't.Comm.1989) (to be codified at 19 C.F.R. § 355.43(b)(4)) (proposed May 31, 1989) (*Proposed Regulations*). Under this test, the absence of an affirmative finding for each of the three prongs indicates the infrastructure is specific. The three prongs are:

> (1) The government does not limit who moves into the area where the infrastructure has been built, (2) the infrastructure that has been built is in fact used by more than a specific industry or enterprise, or group of enterprises or industry, and (3) those that locate there have equal access or receive the benefits of the infrastructure on the basis of neutral criteria.

*Korean Final Determination*, 58 Fed.Reg. at 37,346. Applying the test to Kwangyang Bay, Commerce found that although information on the record was not conclusive as to the third prong, "because the nature of the infrastructure provided to POSCO at Kwangyang Bay Industrial Estate fails at least two out of the three prongs of our test, we determine that the provision of infrastructure is specific." *Id.* at 37,347.

Respondents argue Commerce erred in finding the GOK's expenditures for infrastructure in conjunction with the Kwangyang Bay Industrial Estate were countervailable. In so doing, Respondents contend: (1) the GOK's provision of infrastructure is a normal and expected function of government which is not countervailable; (2) Commerce's determination is not in accordance with established standards for determining whether infrastructure provided by a government is countervailable, specifically, (a) Commerce erred in finding the GOK limits who can access government-provided infrastructure, (b) Commerce's finding that Kwangyang Bay infrastructure is not used by more than a specific enterprise or industry is not supported by substantial evidence, and (c) in the

context of the entire industrial estate system, Commerce's determination that the evidence regarding equal access to Kwangyang Bay infrastructure on the basis of neutral criteria was "not conclusive" is not supported by substantial evidence; and (3) Commerce errantly determined POSCO's exemption from paying dockyard fees at port berths constructed at POSCO's expense conferred countervailable benefits.

■ The Court rejects Respondents' contentions on this point. Respondents argue the GOK's provision of infrastructure is a normal and expected function of government which is not countervailable. This Court, however, has noted that

> a generally available benefit—one that may be obtained by any and all enterprises or industries—may nevertheless accrue to specific recipients. General benefits are not conferred upon any specific individuals or classes, while generally *available* benefits, when actually bestowed, may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties.

*Cabot Corp. v. United States*, 12 CIT 664, 673, 694 F.Supp. 949, 956 (1988). Commerce's determination that the GOK's provision of infrastructure to the Kwangyang Bay Industrial Estate is specific to POSCO, if supported by substantial evidence on the record, comports with the statutory requirements for finding a countervailable subsidy. *See* 19 U.S.C. § 1677(5)(A)–(B) (1988).

■ In addition, the Court is satisfied substantial evidence on the record supports Commerce's determinations with respect to the tripartite specificity analysis. Evidence supports Commerce's finding that the GOK limits access to the Kwangyang Bay Industrial Estate. First, as pointed out in Respondents' Administrative Case Brief, industrial estates are designated for particular types of industries. (Resp.'s Admin.Br. at 68–69, *reprinted in* Commerce's Resp.App. Ex. 9.) Additionally, the Kwangyang Bay estate is "centered around ... the iron and steel industry, and its subsidiary and related industries," *Korean Final Determination*, 58 Fed.Reg. at 37,347 (citing GOK's Supp. Questionnaire Resp. at 9), and " 'certain industries

are considered inappropriate for Kwangyang Bay,'" *id.* (citing GOK's Questionnaire Resp. at 50). The Court is satisfied there is substantial evidence on the record supporting Commerce's determination that the GOK limits which industries can operate in the Kwangyang Bay Industrial Estate, and thus limits which industries have access to the infrastructure supporting the estate.

The Court also finds substantial evidence on the record supports Commerce's determination that the infrastructure in the Kwangyang Bay Industrial Estate is not used by more than a specific enterprise or industry. The GOK's questionnaire responses state that only eight of the fifty-two industries in the Kwangyang Bay Industrial Estate use the port facilities, *id.* (citing GOK's Questionnaire Resp. at Ex. D–10), and that POSCO was responsible for the "vast majority of the goods shipped into and out of the port" during the period of investigation, (GOK's Questionnaire Resp. at 53, *reprinted in* Commerce's Resp.App. Ex. 1). In addition, Commerce determined the industrial water system in the Kwangyang Bay area was expanded as a direct result of the needs of POSCO, and that POSCO is the dominant user of the road and railroad infrastructure in the Kwangyang Bay Industrial Estate. *Korean Final Determination,* 58 Fed.Reg. at 37,347.

With respect to the third factor of the tripartite specificity analysis, Commerce determined the evidence on the record was inconclusive. Commerce's findings regarding the first two factors, however, provide sufficient basis for its determination that the GOK's provision of infrastructure in the Kwangyang Bay Industrial Estate is specific, and as previously noted, the Court finds Commerce's determination to be supported by substantial evidence on the record and otherwise in accordance with law.

Finally, Respondents assert Commerce erred in determining POSCO's exemption from paying dockyard fees at port berths constructed by POSCO constituted a countervailable benefit. (Resp'ts' Br. at 77.) Respondents argue that by constructing the fifteen docks with its own funds, "POSCO relieved the Government of a cost it would normally assume and has assumed in constructing Korea's port system," and therefore "POSCO did not receive any benefit." (*Id.* at 80 (emphasis and footnote omitted).)

In response, Commerce notes that it analyzed the dockyard fee exemption from two perspectives. (Commerce's Resp. at 61.) First, Commerce explains the GOK's exempting POSCO from dockyard fees in order to reimburse POSCO for construction costs "'creates a countervailable benefit ... because the GOK is relieving POSCO of an expense the company would otherwise have incurred [in constructing the docks].'" (*Id.* at 63 (quoting *Korean Final Determination,* 58 Fed.Reg. at 37,348).) Additionally, Commerce analyzed the exemption from dockyard fees as a separate program, unrelated to reimbursing POSCO for the construction costs it incurred in building the docks. Commerce concluded the exemption was countervailable "because it excused POSCO from paying fees it would have otherwise had to pay." (*Id.*)

The Court finds that regardless of whether the GOK's exempting POSCO from dockyard fees is analyzed as reimbursement for costs incurred by POSCO in constructing the docks, or as a separate program, Commerce's determination that POSCO's exemption from dockyard fees is a countervailable benefit is supported by substantial evidence on the record and is otherwise in accordance with law.

### 5. Countervailability of GOK's Provision of Direct Foreign Loans to the Korean Steel Industry

Respondents' challenge on the issue of foreign loans overlaps substantially with the issue of direct foreign loans argued under the disproportionality aspect of these proceedings, discussed above. In their country-specific challenge, Respondents argue: (1) no record evidence exists of GOK involvement in the provision of direct foreign loans or demonstrating these loans conferred a countervailable benefit upon the recipient; (2) Commerce erred in finding the GOK provided the steel industry with preferential access to foreign currency loans because (a) the GOK has general macroeconomic concerns for control-

ling the inflow of foreign currency, (b) the GOK's policies merely ensured "access" to foreign currency for all sectors of the economy, and (c) Commerce's determination of *de facto* selectivity was flawed; and (3) Commerce erred in measuring the benefit for foreign currency loans by applying a Korean won benchmark.[18]

The Court rejects Respondents' country-specific challenge on this issue. This Court has already sustained Commerce's finding of a government program and the provision of preferential access to foreign currency loans. *See supra* parts A, B.3. To the extent Respondents' arguments here may not be subsumed by the *Redetermination*, the Court will not disturb the agency's decision simply because Respondents have advanced a different view of the evidence. *See Consolo*, 383 U.S. at 620, 86 S.Ct. at 1026.

■ Additionally, as to Respondents' claim concerning Commerce's measurement of the benefit, Commerce explains that because the Korean foreign currency market would not have been able to supply the funds required by the steel industry, and the primary bond market was also determined to be under GOK control, the won interest rate on three-year corporate bonds sold in the secondary market provided an appropriate benchmark to measure the benefit received by direct foreign loans made to the steel industry with GOK approval. (Commerce's Resp. at 43.) The Court finds Commerce's explanation regarding its use of the yield on three-year corporate bonds on the secondary market is supported by substantial evidence and otherwise in accordance with law.

6. Excess Duty Drawback Received by Union on Certain Cold–Rolled Steel Products

In the *Korean Final Determination*, Commerce determined that two of the Korean producers, Union and PSI, received excessive duty drawback. *See Korean Final Determination*, 58 Fed.Reg. at 37,349. Commerce explained the GOK had stated that Korea's

Industrial Advancement Administration (IAA) factors recoverable scrap into the calculation of the usage rates based on the economic value of the scrap, and that this is done for all products under Korea's duty drawback regime.... In situations where production methods are similar and technology relatively stable, the IAA issues an average input usage rate. However, the GOK states that if a producer becomes appreciably more efficient than the average, it is supposed to use its own rate. *Id.* At verification, Commerce found that for some of Union's cold-rolled steel products, it "claimed duty drawback at the higher, standard rates when it should have claimed duty drawback at its own usage rate, which was lower than the standard." *Id.*

■ Respondents challenge Commerce's finding of excessive duty drawback on two grounds. First, Respondents argue Commerce's determination is at odds with Commerce's verification findings. In response, Commerce notes the personnel conducting the verification "merely noted a discrepancy between the actual usage rate provided at verification and the standard rates reported in the questionnaire response." (Commerce's Resp. at 65–66.) Commerce also explains the excessive duty drawback determination is based on the weighted average actual rate for all the cold-rolled products listed in Union's financial statement, rather than the actual rate "[b]ecause Union failed to provide product specific actual usage rates." (*Id.* at 65.) The Court finds Commerce's inability to obtain and verify the actual usage rate during the investigation makes reasonable its reliance on the weighted average actual usage rate rather than the actual rate.

■ Second, Respondents argue even if Commerce correctly found Union received excessive duty drawback, it made three errors in calculating the amount of the benefit. Respondents first argue Commerce overstated the excess duty drawback by applying

---

18. In the *Korean Final Determination,* Commerce explained that it used a local (won) currency benchmark—the yield on three-year corporate bonds on the secondary market—to calculate the

benefit from access to direct foreign currency loans. *See Korean Final Determination,* 58 Fed. Reg. at 37,346.

a ratio based on a differential between actual and standard usage rates for hot-rolled steel used in cold-rolled products to Union's total duty drawback for all materials used in all products. Commerce responds that in addition to including the total amount of excess duty drawback received on all products in the numerator, it included the total sales of all products in the denominator, and therefore there could be no overstatement of the benefit received by any one steel product. The Court finds Commerce's methodology reasonable because it spread the benefits received from excess duty drawback among all products, and therefore did not overstate the benefit received by the relevant products.

■ Respondents next argue Commerce erred in relying on the highest standard rate for cold-rolled sheet products in determining Union received excessive duty drawback, despite the fact that 97 percent of Union's exports of cold-rolled products were cold-rolled coil, which has a lower standard rate. Commerce responds that because Union failed to provide the product-specific actual usage rates, Commerce was unable to calculate the benefit based on product-specific rates, and therefore was justified in using the highest standard rate. The Court finds Commerce's reliance on the highest standard rate was reasonable under the circumstances and is supported by substantial evidence on the record and is otherwise in accordance with law.

Respondents' final argument asserts that Commerce's calculation of a countervailing duty rate for both cold-rolled and corrosion resistant products was erroneous because Commerce neither verified nor determined that Union received an excessive rebate for corrosion-resistant products. Commerce argues that because Union failed to provide any product-specific information about its corrosion-resistant products, Commerce acted reasonably in applying the weighted average actual use rate for cold-rolled products in reaching a determination on corrosion-resistant products. The Court finds that because the record contained no actual use rates for corrosion-resistant products, Commerce's determination is supported by substantial evidence on the record and is otherwise in accordance with law.

## 7. Countervailability of Certain Electricity Usage Discounts

■ In the *Korean Final Determination,* Commerce found countervailable benefits were provided to the steel industry with respect to two types of discounts applied to electricity charges for certain firms. *See Korean Final Determination,* 58 Fed.Reg. at 37,350. The first discount, which Commerce found POSCO and Dongbu received, is known as a "power factor" and ranges from zero to five percent of the base charge for electricity usage. The second discount, received by POSCO and POCOS, occurred when the companies limited their power usage at peak times in response to requests from the Korea Electric Power Company (KEPCO) to do so. Commerce found this discount was provided for in a written agreement between POSCO and KEPCO.

Respondents contend Commerce erroneously used best information available to determine the electricity rate adjustments were countervailable. Commerce responds it requested information from the GOK and Respondents concerning the rate schedules for electricity, but neither the GOK's response, nor the responses of the Respondents included any mention of the two discounts. Commerce subsequently discovered the discounts during verification.

Respondents' failure to include any information concerning the preferential electricity rates received makes their questionnaire responses incomplete, and justifies Commerce's finding a failure of verification. The statute authorizes Commerce to resort to best information available when it is unable to verify information necessary to its decision. *See* 19 U.S.C. § 1677e(b) (1988). Because none of the Respondents included information about the power factor or restricted use discounts in their questionnaire responses, there was no information on the record to confirm during verification. Accordingly, Commerce properly resorted to best information available in concluding that the electricity discounts were selectively provided and therefore countervailable.

The Court finds Commerce's determination to be supported by substantial evidence on the record and otherwise in accordance with law.

8. Attribution to POSCO and Dongkuk Steel Mill Company, Ltd. (Dongkuk) of Benefits Received by Certain Related Parties

 Respondents maintain Commerce improperly attributed to POSCO and Dongkuk the benefits of subsidies found to have been received by certain related entities. According to Respondents, "[t]his fact is not discussed in the final determination notice and ... was only revealed in the disclosure documents released to counsel after the final determination." (Resp'ts' Br. at 90 n. 185.) Respondents argue this is contrary to Commerce's long-standing policy of treating related companies as a single entity in countervailing duty investigations, and that Commerce has failed to explain why, in the present case, it was appropriate to treat the related parties as a single entity.

Respondents' argument fails to give appropriate weight to the concerns expressed by the Court in *Armco Inc. v. United States,* 14 CIT 211, 733 F.Supp. 1514 (1990). In *Armco,* the Court noted the countervailing duty statute "should not be circumvented by corporate formalities or maneuvering." *Armco,* 14 CIT at 223, 733 F.Supp. at 1523. The record contains evidence that both POSCO and Dongkuk have ownership interests of a sufficiently large magnitude in related parties which sell or produce the subject merchandise such that circumvention of the countervailing duty order could arise if the related parties are not collapsed with Respondents. The Court finds Commerce acted reasonably in collapsing POSCO and Dongkuk with their related parties for purposes of the countervailing duty investigation, and its determination is supported by substantial evidence on the record and is otherwise in accordance with law.

Additionally, the Court rejects Respondents' assertions that Commerce failed to provide Respondents with an effective opportunity to comment on whether the related parties should be collapsed with Respondents for purposes of the countervailing duty investigation. Commerce's interest in and intention to collect relevant information concerning related parties was revealed early in the investigation by questions addressing related parties in the initial questionnaire. (*See* Commerce's Resp. at 75 (reprinting GOK Questionnaire at 3–1).) Furthermore, in response to Respondents' objection to the scope of the initial questionnaire's definition of related party, Commerce sent Respondents a letter in October 1992 providing Commerce's revised definition of related party, which reflected the concerns raised by Respondents. (*See* Commerce's Resp.App. Ex. 20.) The Court finds there was sufficient notice to alert Respondents to Commerce's interest in the related parties, and of the potential that those related parties and Respondents would be treated as a single entity.

· CONCLUSION

After consideration of Commerce's remand determination on the general issue of disproportionality and the arguments of all parties thereon, and the arguments of all parties regarding the country-specific issues raised in *Laclede Steel,* this Court holds: (1) on the issue of disproportionality, Commerce's remand determination is sustained; and (2) in *Laclede Steel Co. v. United States,* Consol. Court No. 93–09–00569–CVD, (a) Domestic Producers' and Respondents' motions for judgment on the agency record are denied, and (b) *Laclede Steel Co. v. United States,* Consol. Court No. 93–09–00569–CVD, is dismissed.

JUDGMENT ORDER

This matter having been submitted for decision, after due deliberation it is hereby

**ORDERED** that Commerce's remand determination on the issue of disproportionality, *Final Results of Redetermination Pursuant to Court Remand* British Steel plc v. United States Slip Op. 95–17 (Feb. 9, 1995), is sustained; and it is further

**ORDERED** that Domestic Producers' and Respondents' motions for judgment on the agency record filed in *Laclede Steel Co. v.*

*United States,* Consol. Court No. 93–09–00569–CVD, are denied; and it is further

**ORDERED** that *Laclede Steel Co. v. United States,* Consol. Court No. 93–09–00569–CVD is dismissed.